IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 9, 2025 Session

**VICTOR TREZEVANT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 08-02225          Chris Craft, Judge**

————————————————————

**No. W2024-01198-CCA-R3-PC**

————————————————————

Petitioner, Victor Trezevant, was convicted by a Shelby County jury of first degree felony murder committed during the perpetration of an attempted aggravated robbery, for which he received a life sentence. He subsequently filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. On appeal, Petitioner contends that the post-conviction court erred when it denied relief on his claims of ineffective assistance of trial and appellate counsel. Following a thorough review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and MATTHEW J. WILSON, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Victor Trezevant.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steve Mulroy, District Attorney General; and Daniel Woodford and Karen Cook, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

The facts of Petitioner's case were summarized by this court on direct appeal, as follows:

Mr. Jimmie Bradford, the victim's father, testified that the victim[, Taylor Bradford,] grew up in Nashville, Tennessee. The victim attended Samford

University on a football scholarship and later transferred to the University of Memphis. On September 30, 2007, Mr. Bradford was notified that his son had been fatally shot. . . . He identified the victim's cellular telephone number at that time as (615) 480-3316.

Officer Robert Frans, a veteran of the University of Memphis Police Services, testified that on the night of the offense he was working the three to midnight shift. At approximately 9:45 p.m. that night, he observed a car "crashed into a tree" on the east side of Zach Curlin Street on the campus of the University of Memphis. He observed the occupant inside the car with the steering wheel crushed down onto his lap. He contacted rescue and an ambulance. He could not determine the condition of the occupant and said he was "non[-]responsive." He observed the paramedics and the fire department pry the doors from the car to extricate the victim.

Officer Frans stated that he initially thought the incident was "a crash" and contacted the specialized traffic unit of the Memphis Police Department (MPD). However, once the victim was placed inside the ambulance he was notified of a gunshot wound to the victim. He then notified MPD felony response unit. The paramedics gave Officer Frans the contents of the victim's pockets including $7,400 in cash and a shell casing from the floorboard of the car.

Officer Frans stated that three students from the Carpenter Complex, one male and two female African Americans, approached him to advise that they overheard gunshots. He gathered their identification information and told them to wait for MPD, who eventually placed the students in the back seat of their squad cars. . . . Officer Frans explained that students who paid for parking privileges were provided with a parking permit access card. The card was swiped at the entry gate to gain access. There was additional parking outside the complex for those without an access card. Officer Frans said that an individual may walk inside the complex; however, a car could not enter without an access card.

Michael Wissman, an EMT with the Memphis Fire Department, testified that he responded to the scene on the night of the offense. When he approached the car the victim was not breathing. He entered the passenger side of the car, placed the victim on a backboard, and slid him out of the passenger side of the car onto a stretcher. As he pulled the victim out of the car, he observed "a lot of blood starting to come from the victim." He observed the victim had "an entrance wound, underneath his right side on his

right flank." He then advised his Lieutenant that the victim had "something that resembled a gunshot wound."

. . . .

On the night of the offense, Officer Gerald Paige of the Memphis Police Department Crime Scene Unit took photographs and collected evidence. He observed that the interior of the car had "heavy damage to the steering wheel, the dashboard, and there was a shoe on the seat on the passenger side of the vehicle." A nine-millimeter Luger spent bullet casing was recovered from the floorboard on the passenger side of the vehicle and admitted into evidence. . . .

Agent Cervinia Braswell, a forensic scientist assigned to the firearms identification unit of the Tennessee Bureau of Investigation (TBI), testified as an expert in the area of firearms identification. She received one bullet and one cartridge case from the investigation in this case. She was asked to determine if the bullet came from that particular cartridge case and whether she could determine the caliber and make of the weapon. She compiled a report of her analysis and findings, which was admitted into evidence. Agent Braswell determined that the cartridge case was an Independent brand, nine-millimeter cartridge case. She further determined that the bullet was a nine-millimeter caliber, full metal jacket bullet. On cross-examination, Agent Braswell acknowledged that the bullet recovered in this case was not connected to the shell casing recovered from the victim's car. She further confirmed that she could not connect the shell casing to a gun because a gun was not recovered in this case.

At the time of the offense, Katura Fennell was a student at the University of Memphis. In the early evening on the night of the offense, Ms. Fennell went to the Laundromat at Carpenter Complex to wash clothes with her friends, Lakeitha Odes and Shameeka Toney. When she arrived, she observed a gold Grand Marquis parked "backwards," obstructing the view of its license plate, with the engine off, the windows down, and three people inside. She could not see their faces. She noted this behavior was unusual because there was normally a lot of activity going on in this area; however, on this occasion, she did not hear anything. After putting her clothes in the washer, she and her friends "stayed outside and associated" with some of the football players. When she returned to place her clothes in the dryer, she noticed two people walk by her. She did not "notice [this behavior] to be suspicious until they did it a second time." Twenty minutes later, she heard

a gunshot. Fifteen minutes after she heard the gunshot, she saw the victim's car speed past her, hit a speed bump, and go airborne. Ms. Fennell additionally testified that she knew Devin Jefferson and did not see him while she was waiting on her clothes that night.

Mr. Darius Davis, a friend and teammate of the victim's, testified that he was aware that the victim had "come into some money." Mr. Davis stated that one night in the team hotel the victim "was sending pictures of some money he had . . . got from a casino or somewhere." Davis confirmed that the money the victim received was in cash. On the night of the offense, Davis was in his room and heard a gunshot. He also heard "a car screeching down the . . . backside of the apartments." Upon hearing this, Davis stepped outside of his room and observed "some guys coming from where the . . . gunshot had c[o]me from." He did not know how many individuals were present but was certain that it was more than one. A few minutes later, Davis received information that the victim had crashed his car across the street. At the time of the offense, Davis did not know Devin Jefferson or Erica Bell. On cross-examination, Davis acknowledged his concern for the victim because he was "flashing" his money around and people were "talking about it all over."

Mr. Steven Turner, a friend and teammate of the victim's, testified that he was outside the Carpenter Complex on the night of the offense. He spoke with "Katura and Kiki" for a while, and then more of his teammates came to the complex. Five minutes later, he heard a gunshot. He was about to walk in the opposite direction when he saw the victim's car come around the corner. He tried to flag the victim down, but the victim's car was going too fast. Turner said the victim "hollered something out the window," but Turner did not understand him. Twenty seconds later, two other individuals came around the corner. He did not see their faces. Turner said there was "a split second" between the gunshot and when he saw the victim's car.

Turner explained that a year before the offense, Devin Jefferson and the victim had a conflict over a girl. He testified that the victim and Jefferson "had some words and they began to fight." Turner witnessed the fight and said it took place outside in front of a crowd of people. Turner opined that the victim and Jefferson wanted to fight each other and that no one was seriously injured after the fight. Turner was also aware that the victim had won some money from a casino sometime in September 2007. He observed pictures of the money in quantities of "hundreds [and] twenties" in cash. On cross-examination, Turner recalled the first name of the girl over whom the victim and Jefferson fought was "Erica." Turner acknowledged that during

- 4 -

the fight, the victim attempted to walk away but Jefferson continued to fight. Turner said initially the victim "got the best of Jefferson," but the second phase of the fight resulted in a stalemate. Turner also clarified that he told police on the night of the offense that he saw the victim's car within "thirty seconds to two minutes" after hearing the gunshot.

Daeshawn Tate, also charged with the murder of the victim, testified that he had received no agreement from the State for his testimony and was nevertheless expecting some consideration for his truthful testimony. Tate acknowledged that he knew Devin Jefferson, Courtney Washington, and [Petitioner]. Tate said they grew up in the same neighborhood and went to school together. He had known Courtney Washington for approximately ten years and Devin Jefferson and [Petitioner] for about twelve years. Just prior to the day of the offense, Tate was contacted by Devin Jefferson and asked if he wanted to make some money. Tate told him yes, and rode with Courtney Washington and [Petitioner], to Jefferson's dorm room, located in Richardson Towers. Of the four friends, Devin Jefferson was the only one enrolled as a student at the University of Memphis.

Once they arrived at Jefferson's dorm room, Jefferson told them about "a guy who was on campus who had a large lump sum of money and he was flashing it around." Tate said that the group discussed robbing the guy. Everyone in the group agreed to rob the individual; however, it was Tate's understanding that no weapons would be used. Tate left the room for about two hours to visit with a girlfriend. When he returned, the group told him he had taken too long and decided to do the robbery the next day.

The next day, Jefferson contacted Tate and asked if he was "ready" to which Tate replied, "okay." Tate contacted Courtney Washington, who picked him up in his car and drove to pick up [Petitioner]. The group returned to the college campus and notified Jefferson to come downstairs once they arrived. Jefferson entered the car and showed them where the victim lived. Jefferson handed the access card to Courtney Washington, who was unable to operate the card. Jefferson got out of the car and swiped the access card for entry, which enabled the car to enter the parking lot. Tate identified the entry card that was used to enter the parking lot, which was admitted into evidence. Jefferson then pointed out where the victim lived and the group "left back out."

At this point, Tate said Jefferson separated from the group and Tate, Courtney Washington, and [Petitioner] "backed in" and parked. They had

- 5 -

"normal conversation" and realized they were low on gas. Tate testified that [Petitioner] used his phone to call Alex Poindexter to ask for gas money. The group went to Alex Poindexter's house and borrowed money for gas. They then returned to the same parking place and "backed in" to park. Tate called Jefferson before they left and when they returned.

While waiting in the car with Courtney Washington and [Petitioner], Tate said he called the victim and pretended to be someone else. He had obtained the victim's phone number from Courtney Washington who had gotten it from Devin Jefferson. Tate said he asked the victim where he was and that the victim told him he was taking care of some paperwork and would call him back. The group waited in the car and contacted Jefferson by phone and told him that the victim was not there. Eventually, the victim called Tate back and told him he was "here." Tate told the victim that he was "here." Prior to exiting the car, Tate saw [Petitioner] pull out a gray nine-millimeter gun. Tate said he was unarmed.

Tate and [Petitioner] walked through another entry way to the Carpenter Complex where the victim lived. They did not see the victim's car and turned around to walk away. After a few minutes, [Petitioner] recognized the victim's car coming towards them and flagged it down. Tate went to the driver's side of the car and spoke with the victim. Tate asked how he was doing and if the victim played football for the school. Tate said the victim said, "I'm cool" and looked at him "kind of funny." Tate testified that [Petitioner] came to the passenger's side of the car, "cocked the weapon, and asked him, man, give me the money."

Tate said the victim "kind of panicked, and he hit the gas, and he reached for the gun, and the gun went off. The gun went off. . . . [The victim] just kept going out of the . . . complex[.]" As the victim sped off, Tate asked [Petitioner], "what the f—did you shoot him for." Tate said [Petitioner] replied, "[the victim] reached for the gun[.]" The two men then walked back to the car and drove to Alex Poindexter's house. Tate said that Courtney Washington was still inside the car, a four door gold Grand Marquis. Tate then called Jefferson and told him that [Petitioner] shot the victim, they did not get any money, and the robbery did not "go right." Tate said they were in constant phone contact with Jefferson throughout the night of the offense. Tate confirmed that his phone number was (901) 649-7337. A few days after the offense, Tate was arrested and provided a statement to police detailing his involvement in the offense.

On cross-examination, Tate acknowledged that he was unaware of the felony murder law or the concept of criminal responsibility for another. At the time he gave his statement to the police he did not know that he could be charged with murder even though [Petitioner] shot the victim. Tate also refused to cooperate with the police investigation until Officer Parks, his former high school football coach, came to speak with him. Officer Parks told Tate that if he had anything to do with the shooting, Tate should tell the truth. Finally, Tate acknowledged that neither Courtney Washington [n]or [Petitioner] had a phone on the night of the offense.

Michael Stewart, the custodian of records for Cricket Communications, testified regarding the subscriber information pertaining to phone numbers (901) 949-2267 and (901) 649-7337. Mr. Stewart confirmed that Devin Jefferson was the subscriber for the phone number ending in 2267, and [Daeshawn] Tate was the subscriber for [the] phone number ending in 7337. On the night of the offense, there were eighteen calls between Jefferson's and Tate's phone. The first call occurred at 7:21 p.m., with repeated calls made every other minute or so until the last call at 11:09 p.m. The phone records for [Daeshawn] Tate's phone number, ending in 7337, also showed a call to phone number (615) 480-3316. Mr. Stewart explained that code *67 was placed on the call to prevent the person being called from seeing the number of the incoming call. According to the records, around 9 p.m. on the night of the offense, seven calls were made between Jefferson's and Tate's phone numbers.

Ms. Tanera Tate, an employee at the University of Memphis parking office, managed the online system for students who purchased parking permits. She explained that a permit has a magnetic stripe on the back of it which enables cars to gain access through the gates. She retrieved her records from the night of the offense for permits belonging to the victim and Erica Bell. Erica Bell's permit was used to gain access into the gate at 7:08 p.m. and 7:34 p.m. The victim's permit was used to gain access into the gate at 8:42 p.m.

Ms. Erica Bell met the victim when they were in high school in Nashville. She stated that he was her boyfriend until college and they "went [their] separate ways." While in college, Bell met Devin Jefferson who became her boyfriend. Bell confirmed that the victim eventually attended the same college and had "friction" with Devin Jefferson. On the night of the offense, Bell, who also resided at the Carpenter Complex, picked up Jefferson from his dorm at about 7 p.m. She said she called Jefferson first

and was going to cook him dinner. She used her permit to access the gate at 7:08 p.m., as reflected by the parking records, when she returned to the Carpenter Complex with Jefferson. Bell said once at her dorm room, she and Jefferson ate, took a shower, and went to bed. She said Jefferson did not remain there the entire time. She said Jefferson went outside multiple times in ten-minute intervals to talk on the phone. Between 10:20 p.m. and 10:40 p.m., Jefferson left and did not return. Jefferson used Bell's car to leave. Bell denied using her permit at 7:34 p.m. and could not explain the entry. Bell did not know Courtney Washington or Daeshawn Tate; however, she stated that she had met [Petitioner].

. . . .

Mr. Alex Poindexter testified that he was friends with Devin Jefferson, Courtney Washington and Daeshawn Tate, and that he was close friends with [Petitioner]. On the day of the offense, Poindexter saw [Petitioner] twice. He explained that [Petitioner] came to borrow gas money. He said Courtney Washington drove [Petitioner] to Poindexter's house which was ten minutes away from campus. He saw [Petitioner] again a couple of hours later at his house. He said Courtney Washington drove [Petitioner] to his house and Daeshawn Tate was in the car with them. Up until this point, Poindexter had not seen Devin Jefferson. He said after Daeshawn Tate and Courtney Washington left, Devin Jefferson came to his house. Poindexter said that Jefferson came by himself and [Petitioner] was still at his house. Poindexter said they learned of the offense on campus on the news but neither [Petitioner] nor Jefferson discussed any involvement in the offense with him. He said Jefferson and [Petitioner] left his house together around eleven that night. Poindexter said that Jefferson "just showed up" at his house that night without calling first.

Sergeant Mundy Quinn, a veteran of the Memphis Police Department, testified that on October 7, 2007, Courtney Washington, Daeshawn Tate, and [Petitioner] were brought into custody at different times and placed in different rooms in his bureau. Sergeant [Quinn] advised [Petitioner] of his *Miranda* rights through an Advice of Rights form, which was admitted into evidence. [Petitioner] signed the form, acknowledging that he understood and waived his rights. Sergeant [Quinn] stated that he was already in the process of interviewing Daeshawn Tate when [Petitioner] arrived and was requested to assist with [Petitioner's] interview. Sometime later, Sergeant [Quinn] returned to interview Daeshawn Tate, and [Petitioner] ultimately provided a statement to Sergeants [Ronald] Collins and [Connie] Justice. On

cross-examination, Sergeant [Quinn] said the suspects were taken into custody in the following order: Courtney Washington, Daeshawn Tate, and [Petitioner].

Lieutenant Mark Miller of the Memphis Police Department testified that he was involved with the instant homicide investigation. Through the course of his investigation, he determined Daeshawn Tate, Courtney Washington, and Devin Jefferson were suspects. Lieutenant Miller said [Petitioner] was "named by a witness, and then, we picked up one of the co-defendants based on that same information, and he was identified[.]" He said Kimberly Jude, the girlfriend of Daeshawn Tate, was the witness who identified [Petitioner]. Asked if he interviewed [Petitioner], Lieutenant Miller said "not technically." After completing the investigation for the evening, Lieutenant Miller entered [Petitioner's] interview room with an arrest ticket to obtain a thumb print from [Petitioner]. [Petitioner] inquired as to the charges against him, and Lieutenant Miller told him he was being charged with first degree murder. When [Petitioner] asked how they could charge him with that offense, Lieutenant Miller told him that there were witnesses who identified him as planning the robbery and also as the person responsible for shooting the victim. At this point, [Petitioner] told Lieutenant Miller that although he was involved in the robbery Devin Jefferson was the actual shooter.

Sergeant Connie Justice of the Memphis Police Department was responsible for typing [Petitioner's] formal statement. Prior to taking his statement, Sergeant Justice advised [Petitioner] of his *Miranda* rights again, which he waived. [Petitioner's] formal typed statement read, in pertinent part, as follows:

[Question]: Do you know Taylor [Bradford]?

[Answer]: No.

[Question]: Do you know who is responsible for the death of Taylor Bradford?

[Answer]: Yes. Devin Jefferson.

[Question]: Were you present at the time that [Taylor] Bradford was shot?

[Answer]: Yes.

[Question]: Who else was present when Taylor Bradford was shot?

[Answer]: Daeshawn Tate.

[Question]: In your own words, explain what happened when Taylor Bradford was shot?

[Answer]: Devin called me on Alex's phone at Alex's house about two or three weeks ago, and he told me that he was fighting this dude whose ex-girlfriend he was talking to now and dude was hating on him. It was whenever the last fight was between Devin and the dude, and the dude slammed him in a tree. He said this dude is stalking him, and he's been getting locked up by the police because the dude said he had weed. So, Devin called us back and said that there was a dude up on campus flashing money. He called me back and told us to meet him at Memphis State on Saturday night, the night before the shooting. He met us downstairs and we took the elevator up to room number 601, I think, but it's the last room to the left. It has Jefferson on the room, and I think he shares the room with his brother, Quez. Devin got in the shower. Me, Daeshawn, and Quez, was rapping on the computer. They got a microphone on it. We didn't talk about it up there. Daeshawn left and went with his girlfriend. Me, Cornbread, and Devin, went downstairs and got something to eat. Then, we got in the car and we started talking about it. He said he knew this dude that had three to four thousand dollars. He said he could use the key and get us in there because he used to talk to the girl that Taylor used to like. But it was too late. Daeshawn and his girlfriend came back. All of us finished, was standing outside smoking. Daeshawn talked for a minute, then he left. Me and Cornbread drove off and Devin went back in the dorm. We asked Devin when he wanted us to come back, and he said that he had to go to work at twelve o'clock p.m., and Cornbread had to go to work at eleven a.m. He said he was going to call us. On Sunday, September the 30th, 2007, Cornbread was driving, Daeshawn was on the passenger side, and I was in the backseat. We was looking for Devin. We went back up to the Towers. Daeshawn texted Devin and asked him where he was, and Devin called him back. Devin asked me if I remembered where Erica lived, and I didn't, so Daeshawn handed me the phone, and Devin told me where to go. He told us he was going to talk to us to tell us where to go. It was like by a big arrow on a sign, like some apartments, where he told us to turn. When he got past the lights, he told us to look for the arrow that points us where to turn, and when he turned—I'm

sorry—when we turned, we were in a parking lot. These were the second set of apartments. Devin said he was in a white truck. He asked if we saw him, and then, said forget it, because he was fixing to come see us and was getting out of the truck. He got in the car. It was about eight or eight fifteen p.m. He gave us a Memphis State pass. I think it was Erica's. It had to be. Cornbread was driving and he couldn't do the pass thing. We sat there for a few minutes, and finally, he got it when Devin was about to do it himself. We get around in there. He told us to make a right, and drive straight back. Devin pointed out where dude lives. He said that his was the one upstairs to the right. We kept on driving and drove straight out of the complex. Then Devin showed us where to park. It was near the gate where you go in on the other side of the lot. We made a left when we came out of the gate and we backed in. Then Devin told us that he would be back and asked us if we wanted to keep his pass. We kept the pass and Cornbread hung the pass on the rearview mirror or in the seat pocket. Before Devin left, we told him that we needed some gas money and some cigarettes. Devin told us that he ain't got it, he's broke. So, we sat around and waited on him for about ten minutes. I called Alex on Daeshawn's phone and asked him if I could borrow ten or fifteen dollars. He said, yes. So, Daeshawn called Devin and told him that we would be back. While Devin was talking to Daeshawn, Devin told him that the people who live near dude are some weak assed n. He said he didn't know if any of them has any phones in the wall, and then came back and said, yes, they do. Devin had given dude's phone number on Saturday, but we didn't know his name. On Sunday, Devin gave us dude's name said it was Taylor. So, after Devin gave us Taylor's name, Daeshawn called him. It had to be like 8:45 p.m. Daeshawn was using his regular voice and asked him where he was and how long before he came back to the house. Taylor told him that he didn't know, it would be a couple of hours. By the time that we went over to Alex's house, Alex gave me the money, we went to the gas station, pumped the gas, Devin was calling us, saying he was there. So, we're back on our way up there. We park in the same spot. Me and Daeshawn, I didn't remember where Devin showed us that the man lived because I was so nervous. So, we called Devin and told him to show us where. We called Devin three times while we were in the car. We called Taylor two times and he called us back two times. Me and Daeshawn got out of the car. We went straight to the right and made a left. We were walking up that way and we seen Devin. All we were going to do is pretty much scare him. Me and Dae saw so many police we were about to leave waiting on Devin. Me, Devin, and Daeshawn, we see two white people. It was a girl and a guy. But I don't think they saw us. We turned back around so we could walk up and wait for those people to leave and go back in the apartment or whatever. Right where

he lived, we walked back down there and made a right were we first came from. By the time we got there, Devin said, there he goes right now, he was driving past. It looked like a two door white or gray looking clean car that I thought it was a Cadillac, but now, I know it was a Lincoln. How it was supposed to went was I guess Dae was there to intimidate dude for his size and I was there for the money, also fifteen hundred a piece. Devin just sat everything up. Devin was about to show us where Taylor lived again, but Taylor happened to drive past us. Me and Dae flagged Taylor down and got him to stop and Dae started talking to him about football and the fraternities. Taylor looked to his left and saw Dae, then he looked to the right and saw Devin, and then looked on around and saw me. Then dude tried to pull off. Dae pulled his arm off the car and Devin leaned on the front passenger door and looked in there at Taylor. Dude tried to pull off again. Then Devin pulled out a gun and said, pop. Devin tried to pull off again--I'm sorry--dude tried to pull off again, but he stopped, and he said, ahhh, and then he drove off. Dae asked Devin, why did he shoot? Devin started walking off, going straight like the way Taylor lived, and me and Dae started walking the other way. But we seen two or three white people. The only one I remember is a chubby white girl. So, we ducked back around and walked back to the left and that's when we saw a black guy up on the balcony. The guy on the balcony asked us if we saw the shooting and I told him no. He asked if we were all right, and we said yes, and we walked on. People were looking at us. I saw some guy who looked like he played football and he was with a black girl when we was almost to the car. We got in the car and drove to Alex's house. I got dropped off at Alex's house. Dae went over to his girl's house. Devin called me at Alex's and asked me do I got the pass. I told him, no. I left it in Cornbread's car. Alex has a Buick, so, me and Alex went to Dae's girlfriend's apartment to find Cornbread's car to get the pass back. Cornbread had stopped at Big Wheel's house on Rockwood and I stopped and got the pass out of Cornbread's car and went straight back to Alex's house. Devin pulled up in a red Saturn. He came up on the porch. It was me and Alex sitting on the porch. I gave him the pass back, and then he told me that Erica kept telling me there were ambulances out there. Devin wanted me to ride up to Kroger's with him real quick. Once I got there, I discovered the reason that he wanted me there was because he was giving his weed to a guy in a Lexus. While we were riding, everybody kept calling Devin and accusing him of doing it, but he was basically telling them that he didn't do it, that he was the wrong person to talk to because he didn't give a f— about that man. When we were getting ready to leave Kroger[']['s], his manager at Foot Locker called him. I think he spent the night at his manager's house. Devin dropped me off at Brittany's house on East Parkway. He had tears on

his face and he said he loved me, that I was like a brother to him, and he gave me fifteen dollars.

[Question]: Did you speak to Devin after the incident?

[Answer]: Yes, Monday about eight p.m. He told me he just got through being questioned and he was straight but the only thing that was f— up was that Erica had told them that he left the room and wasn't there the whole time, she was supposed to tell the police he was there the whole time.

. . . .

Finally, Sergeant Justice showed [Petitioner] three photographic displays from which he identified Devin Jefferson, Courtney Washington, and Daeshawn Tate. On cross-examination, Sergeant Justice agreed that her investigation revealed "bad blood" between Devin Jefferson and the victim. She further clarified that while Courtney Washington and Daeshawn Tate arrived at the homicide office before [Petitioner], all of the suspects were separated in different offices. Sergeant Justice was also involved in taking Devin Jefferson's statement and agreed that Devin Jefferson changed his story several times. On re-direct examination, Sergeant Justice said that, based on her investigation, Devin Jefferson sent the other three individuals to rob the victim "to get the money," and not because of any "bad blood."

Courtney Washington, also charged with first degree felony murder of the victim, explained that his attorney approached the State about testifying in [Petitioner's] trial. He anticipated some consideration for his testimony but was not made any specific promises from the State. Courtney Washington went to high school with Devin Jefferson, Daeshawn Tate, Alex Poindexter, and [Petitioner]. He acknowledged that he was involved in a plan to rob the victim. The day before the offense, he drove [Petitioner] and Daeshawn Tate to Devin Jefferson's dorm room. Once inside the dorm room, Devin Jefferson began to tell the group about "a guy that had money on him." Devin told them they could rob the individual and that the money would be easy to get. He said the group planned the robbery because they needed money. He admitted that his role in the offense was to drive the group in his car, a gold 1994 Grand Marquis.

Courtney Washington confirmed that after the group discussed the robbery, Daeshawn Tate left and returned too late to execute the robbery that day. The group agreed to commit the robbery the following night. The next

- 13 -

day, Courtney Washington picked up Daeshawn Tate and [Petitioner]. They returned to campus to pick up Devin Jefferson so he could "show [them] who [they] were going to rob and where [the victim] stayed." Devin Jefferson had the access pass and showed the group the victim's dorm room and the type of car he drove. Courtney Washington dropped off Devin Jefferson, and the group waited on his call to advise them when the victim was there.

Washington confirmed the group left to get gas money from Alex Poindexter and, upon their return, "just regularly pulled in" to the parking space. Washington testified that [Petitioner] and Daeshawn Tate got out of the car and walked toward the victim's room. Four minutes later, Washington heard a gunshot and [Petitioner] and Daeshawn Tate were "walking fast back to [his] car." After they drove off, Washington heard [Petitioner] say, "man, I shot dude."

Courtney Washington said that [Petitioner] had a gun when he exited his car. Washington was certain he had a gun because, according to their plan, "[Petitioner] was going to have the gun and Daeshawn was going to get the money." Washington testified that [Petitioner] had a nine-millimeter gun. Washington asked [Petitioner] why he shot the victim, but [Petitioner] "was panicking" and did not give him an answer. Washington then dropped off everyone and went home. Washington agreed that it was not part of the plan to shoot the victim and that they only wanted to get the money. Washington was shown three photographic displays from which he identified Devin Jefferson as the individual who planned the robbery, Daeshawn Tate as the individual with [Petitioner] when the victim was shot, and [Petitioner] as the person who shot the victim. Washington said the original plan was to rob the victim at his dorm room, not in his car.

On cross-examination, Washington agreed that Devin Jefferson and Daeshawn Tate were the only two in the group with working cell phones that night. He further confirmed that after getting gas, the group returned to campus and "backed in" to a parking place by the Laundromat. Washington clarified his earlier testimony and said a gun was not involved in their initial discussions to rob the victim the day before the offense. However, he omitted from his statement to the police any discussion of an agreement made on the day of the offense for [Petitioner] to have a gun as part of the robbery. Of all his friends who were involved in this case, Washington was closest with Daeshawn Tate.

Dr. Karen Chancellor, the Chief Medical Examiner for Memphis and Shelby County, reviewed the autopsy report of the victim and said her "major finding in this case [was] a gunshot wound . . . to the thorax[.]" The bullet entered the right side of the victim's chest and injured several organs inside the body, resulting in internal bleeding. She confirmed that the nine-millimeter bullet examined by Agent Braswell was recovered from the victim's body. With the assistance of several autopsy photographs of the victim, Dr. Chancellor described the bullet path taken within the victim's body and identified the location the bullet was recovered from the victim's body. In her expert opinion, Dr. Chancellor testified that the cause of the victim's death was a gunshot wound. There was no soot or stippling found on the victim's body and his toxicology report did not reveal the presence of any drugs or alcohol.

[Petitioner] offered the following proof. A week prior to the offense, Jennifer McCray, the victim's girlfriend at the time, heard Devin Jefferson threaten to kill the victim. McCray testified that Jefferson specifically said, "if I catch [the victim] slipping, I'm going to kill him." McCray believed "slipping" meant if Jefferson saw the victim alone. [Petitioner] did not testify.

*State v. Trezevant*, No. W2011-00818-CCA-R3-CD, 2013 WL 865331, at *1-9 (Tenn. Crim. App. Mar. 5, 2013), *perm. app. denied* (Tenn. Aug. 21, 2013).[1] Following deliberations, the jury found Petitioner guilty of first degree felony murder committed during the perpetration of an attempted aggravated robbery, and he received a life sentence. *Id*. at *10. This court affirmed Petitioner's conviction on direct appeal, and the Tennessee Supreme Court denied further review. *Id*. at *1.

On August 21, 2014, Petitioner filed a timely pro se petition for post-conviction relief, followed by a pro se amended petition and second amended petition for post-conviction relief. Following the appointment of counsel,[2] Petitioner filed an additional amended petition and supplement to the amended petition. As grounds for relief, Petitioner asserted that he was denied the effective assistance of appellate counsel based upon

---

[1] To assist in the resolution of this proceeding, we take judicial notice of the record from Petitioner's direct appeal. *See* Tenn. R. App. P. 13(c); *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009); *Delbridge v. State*, 742 S.W.2d 266, 267 (Tenn. 1987); *State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964).

[2] As noted in its order denying relief, the post-conviction court appointed several attorneys to represent Petitioner over the course of several years, but each were required to withdraw from the case for various reasons. The court appointed current post-conviction counsel in December 2021.

counsel's failure to argue on appeal that: (1) the trial court erred in denying trial counsel's motion to suppress Petitioner's statements to officers because they did not have probable cause to arrest Petitioner; (2) the trial court erred in denying trial counsel's motion to suppress Petitioner's statements to officers because they were taken in violation of the Fifth Amendment; and (3) the trial court erred in its ruling regarding the raw footage and transcripts of the raw footage from the television program *The First 48*. Petitioner also asserted that he was denied the effective assistance of trial counsel based upon trial counsel's failure to: (1) cite *State v. Ferguson*, 2 S.W 3d 912 (Tenn. 1999), when litigating *The First 48* issue; (2) argue in the motion to suppress fourteen different facts cited in the post-conviction petition; (3) present Petitioner as a witness at the motion to suppress hearing; (4) establish at the motion to suppress hearing that Courtney Washington did not implicate and identify Petitioner until after Petitioner had been arrested; and (5) file a pretrial motion arguing that the indictment was void because it was not signed by the trial court clerk. Petitioner further argued that the cumulative effect of the errors warranted relief.

The post-conviction court held an evidentiary hearing over the course of three days. At the hearing, appellate counsel testified that, in the spring of 2011, he was retained to represent Petitioner on direct appeal. Appellate counsel said that he had been practicing criminal law for about two and a half years at the time and that he had handled several appeals previously, including appeals in first degree murder cases. He stated that he filed a timely motion for new trial, in which he raised the issue of the trial court's denial of the pretrial motion to suppress statements Petitioner made to officers following Petitioner's arrest. He agreed that he filed a timely notice of appeal after the denial of the motion for new trial.

Appellate counsel testified that he had reviewed the transcript of the motion to suppress hearing prior to filing the direct appeal brief. He could not recall why he did not include the issue of the motion to suppress in the brief but testified, "my suspicion is I probably researched these issues and found at the time, with the law existing then, I probably did not have a super strong argument." He testified similarly when asked about the failure to raise an argument on appeal that Petitioner's statements should be suppressed based upon a violation of Petitioner's Fifth Amendment right to remain silent. Appellate counsel explained that he challenged the sufficiency of the evidence on appeal, focusing on "whether or not [Petitioner's] conviction should've stood with the . . . heavy reliance on co[-]defendant testimony." Appellate counsel stated that he could not recall what conversations or communications he had with Petitioner and did not recall if Petitioner had asked him to raise certain issues on appeal. He said, however, that he had a couple of meetings throughout the appeal process with Petitioner's trial counsel and co-counsel. He further stated that he had created a checklist of issues from the motion for new trial, researched the issues, and decided whether the issues had merit.

When asked why he did not include in the appellate brief the issue of the lost raw footage from *The First 48* and the trial court's denial of his request for the show's transcripts of the raw footage, appellate counsel said that, based upon his research, he did not believe the State had a duty to preserve the lost video footage because "it wasn't in the State's custody and control." Further, he testified:

My understanding of the law . . . is that when we have media, the unpublished portions of news and media type things, those unpublished portions have kind of a higher degree of protection, and we were dealing with that. So I think . . . we were up against a First Amendment issue on that one. And . . . I recall doing the research and thinking the law did not support that argument. I recall thinking the First Amendment protected the media outlet.

. . . .

I think I came to the conclusion that that argument ultimately didn't have strong merit, that we wouldn't have been successful with that argument at the time.

Sergeant Justice testified that she interviewed Petitioner following his arrest on October 7, 2007. She said that she began the interview around 9:00 p.m. and that, eventually, Petitioner admitted to his involvement in the shooting. Sergeant Justice agreed that two other officers had spoken to Petitioner earlier that day and that Petitioner had denied any knowledge "of the whole situation" at that time. Sergeant Justice denied ever telling Petitioner that he was not under arrest or that he was "only being looked at as a witness[.]" She said that she typed up Petitioner's statement and then watched Petitioner read and sign the statement, noting that Petitioner made multiple corrections to the statement before signing it. She testified she saw no signs that Petitioner was intoxicated at the time of the interview. She identified the photographic lineup given to Courtney Washington and agreed that he picked out Petitioner and signed the document at 3:52 p.m. on October 7, 2007.

Trial counsel testified that he was retained to represent Petitioner in 2008 through 2011. Trial counsel explained that he had been practicing criminal defense since 1981 and that he had tried numerous murder cases by the time of his representation of Petitioner. Trial counsel further testified that he had been certified by the National Board of Trial Advocacy as a specialist in trial work. He said that he did not have an independent recollection of going over discovery with Petitioner but that he "certainly would assume" that he did and that he sent Petitioner a copy of the discovery materials. Trial counsel agreed that he filed a motion to suppress Petitioner's statements to officers and that the trial court conducted a hearing on the motion. When asked whether he talked to Petitioner about

Petitioner's interactions with officers on the day of his arrest, trial counsel testified, "I would expect that I did. I was -- that would certainly be my course of conduct, but I don't have an independent recollection of that. Just too long ago." He agreed that he did not call Petitioner as a witness at the suppression hearing, explaining:

> The . . . primary reason would be the State's going to get to cross-examine him and that would not be to his benefit or to his case's benefit. So . . . I'm trying to think if I've ever called a defendant to testify at a motion to suppress. Not often, if ever.

Trial counsel stated, "[Y]ou have to balance out, at that point, how worthy and how important that testimony would be if you're going to have two or three police officers come in" and refute Petitioner's testimony.

Regarding trial strategy, counsel agreed that they conceded Petitioner helped plan the robbery because of Petitioner's statement to police, but the defense was that "Devin Jefferson became an independent act that was not foreseeable when he jumped in and killed [the victim]" and that there was not enough corroboration of the accomplices' testimony.

Trial counsel recalled requesting the raw video footage of the defendants' interviews taken by the television show *The First 48*. He testified that he did not pursue the lost footage as a *Ferguson* issue because he did not believe the State had a duty to preserve the footage; he recalled that the State had not possessed the footage and that the private media company had recorded over the footage in the normal course of business.

In the post-conviction petition, Petitioner asserted that, during his police interview:

> he asked for counsel, asked to cut off questioning, was intoxicated during the interrogation, was denied a phone call, was denied use of the restroom, was told that he would receive a life sentence, was told that everybody was saying that he killed someone, was told that he was only being viewed as a witness, was told that he was not under arrest, was told that he would "go down for first degree murder" if he did not talk, and was told that he would never see his child or the mother of his child again.

When asked about Petitioner's claims, trial counsel said that he did not have an independent recollection of Petitioner's telling him these allegations. However, he stated that, if Petitioner had told him these things, he would have included the allegations in the motion to suppress if he "thought it was a legitimate claim[.]" Trial counsel said that, if Petitioner had told him that he was never provided *Miranda* warnings, he would have

- 18 -

included that claim in the motion to suppress. He said that Petitioner never told him he was intoxicated or on drugs during his interview with officers.

Trial counsel agreed that, in his statement to officers, Petitioner identified Devin Jefferson as "the shooter" but admitted to being part of the robbery. Trial counsel acknowledged that Petitioner was arrested at 1:45 p.m. on October 7, 2007, and that Courtney Washington did not circle Petitioner's photograph in the prepared photographic lineup until 3:52 p.m. Trial counsel testified, however, that:

> [t]he thing about it is, is they all three knew each other from years back, I think raised up in the same neighborhood. And so [Courtney Washington] saying, Yes, that's -- [Petitioner] . . . was with us. So he knows [Petitioner].
>
> . . . .
>
> He'd known [Petitioner] for ten or twelve years at the time, I think.

Trial counsel said that, although he looked at Petitioner's indictment, he did not notice that the clerk's signature was not on it. He testified that he had never raised the issue in a case before, acknowledging that the issue "goes around the jail a lot." Trial counsel noted that the indictment was signed by the district attorney and the grand jury foreperson and stated that he was "probably more concerned with the charges." He agreed that he did not file a motion to dismiss the indictment based upon the lack of the clerk's signature and could not recall whether he researched the issue.

Lieutenant Miller testified that he participated in Petitioner's interview on the day of the arrest. He denied ever telling Petitioner that Petitioner was "only being looked at as a witness[.]" He said that he did not recall Petitioner appearing intoxicated during the interview.

Sergeant Collins testified that, in October 2007, he worked in the Homicide Unit of the Memphis Police Department. Sergeant Collins stated that he spoke to Courtney Washington on the morning of October 7, 2007, and that Courtney Washington implicated himself and Petitioner in the victim's murder. He said that he could not recall if Courtney Washington used Petitioner's full name during their discussion. He agreed that he showed Courtney Washington a photographic lineup at 3:52 p.m. Sergeant Collins testified that he also interviewed Petitioner that day but could not recall the time of the interview. Sergeant Collins denied questioning Petitioner without first providing Petitioner *Miranda* warnings. Although he could not specifically recall, he said that he "would normally let the subject read their own *Miranda* [r]ights out loud." He testified that Petitioner signed the Advice

of Rights form at 5:20 p.m. He stated that he did not recall Petitioner's asking for an attorney at any point during the interview and did not recall telling Petitioner that Petitioner was "only being looked at as a witness[.]" Sergeant Collins denied telling Petitioner that he would never see his son or the mother of his son again. Sergeant Collins explained that Petitioner's interview was not recorded by officers and that the film crew from *The First 48* was not in the interview room with them; he testified, "I have no idea where they were recording from, but they [were] not in the room with us." Sergeant Collins agreed that "standard protocol" in the police department was to have a suspect "read out loud their *Miranda* [r]ights" and to read any statement "to themselves or out loud and make corrections to the statement."

Sergeant Quinn testified that he and Sergeant Collins interviewed Petitioner on October 7, 2007. He said that Petitioner signed the Advice of Rights form at 5:15 p.m. and that the interview began at 5:20 p.m. Sergeant Quinn stated that, at the start of the interview, he introduced himself and asked Petitioner if he needed anything, including something to eat or drink, but Petitioner indicated that "he was fine and he didn't need anything." He also asked Petitioner if he was under the influence of intoxicants or narcotics, but Petitioner denied that he was under the influence. Sergeant Quinn testified that he did not ask Petitioner any questions about the case until after advising Petitioner of his *Miranda* rights. He said that Petitioner read the Advice of Rights form out loud; Petitioner then initialed and signed the document and indicated that he understood his rights. Sergeant Quinn denied telling Petitioner that the Advice of Rights form was "mere formality." He denied that Petitioner ever requested an attorney, said that he did not want to speak to officers, or asked to make a phone call. He also denied that he refused to allow Petitioner to use the restroom, when Petitioner requested to do so. Sergeant Quinn stated that he did not "aggressively go after" Petitioner about what co-defendants were telling officers. He denied saying that Petitioner would never see his son and the mother of his son again. He testified that Sergeant Collins did not tell Petitioner that Petitioner was "only being looked at as a witness[.]" Sergeant Quinn said that Petitioner did not provide him with a statement, so he "left and . . . started doing something else regarding the case." He recalled that he interviewed Daeshawn Tate, while Sergeants Justice and Collins continued to interview Petitioner. He stated that he was not involved in taking Petitioner's statement. Sergeant Quinn agreed that *The First 48* was filming during Petitioner's interview but that the officers were not.

Sergeant Quinn testified that, on the morning of October 7, 2007, he spoke to Courtney Washington about the murder and that Courtney Washington implicated Petitioner. Sergeant Quinn explained that Courtney Washington knew Petitioner well; "they were childhood friends, went to high school together. He knew their first names, last names, where they lived, where [Petitioner's] girlfriend lived." Sergeant Quinn agreed that he showed Courtney Washington a photographic lineup later in the afternoon but said that

they already "knew who [Petitioner] was."  He said that Courtney Washington "took [officers] out over off Summer Avenue to show them where [Petitioner's] girlfriend lived[.]"

Petitioner testified that trial counsel met with him several times and that co-counsel met with him one or two times.  He said that he discussed with trial counsel everything that happened during his police interview.  Specifically, Petitioner testified that he told trial counsel:

> [T]he person that picked me up they pointed -- put guns to me.  I really didn't know what was going on.  I told him they never read my rights to me when they attempted to when I met 'em they interrogated me.  They [were] threatening me, told me I'd never see my baby mama, my children again.  They knew my baby mama name.  And said that everybody was sayin' that I killed somebody.

Petitioner said he told trial counsel that his interview began at 2:30 p.m. on October 7, 2007, and that officers questioned him without advising him of his *Miranda* rights.  He stated he told trial counsel that he requested an attorney and told the officers he did not want to talk to them.  He said that Sergeant Quinn later had him sign an Advice of Rights form at 5:20 p.m. and that Sergeant Quinn said the form was "a formality[.]"  Petitioner said that he did not read the form before he signed it.  He stated that he asked to use the restroom and to make a phone call but that the officers refused his requests.  Petitioner asserted that he had been "tired" and "high" during the interview, explaining that he had taken "X pills and . . . smoked a lot of weed."  He said that officers had arrested him at the home of Brittany Bonner.  He explained:

> They knocked on the door, and I seen a lot of police officers out of my sleep.  So I really was, like, I didn't know what was goin' on, to be honest with you.  So . . . I waited for, like, ten or 15 minutes.  I left out the door and that's when they arrested me.

Petitioner stated that, when Sergeant Justice spoke to him, she told him he was not under arrest and that he was "being looked at as a witness."  He denied that Sergeant Justice had gone over his *Miranda* rights before questioning him.  Regarding his typed statement, Petitioner denied telling Sergeant Justice that he was involved in the robbery; he agreed that he signed the statement but stated that he did not read it before signing it.  Petitioner testified:

> I told [trial counsel], I never said these things.  I didn't make [the] corrections on there.  And I didn't say all these things on here.  To be honest, I really was

just tryin' to get out of there. It had been a long day and it was just overwhelming for me and I was just trying to end all of it.

He said that he was twenty-one years old at the time of the interview, that he had a ninth-grade education, and that he had not been previously interrogated by police.

Petitioner stated that, at the time of the motion to suppress hearing, he had a prior felony drug charge, for which he received diversion. He acknowledged that he also had a prior misdemeanor conviction for possession of marijuana. He stated that he had been unaware that he could testify at the motion to suppress hearing and that trial counsel had never discussed the possibility with him. He asserted that he would have testified at the hearing if he had known. Petitioner testified that appellate counsel never discussed with him the issues to raise on appeal.

Following the hearing, the post-conviction court entered a written order denying relief. This timely appeal follows.

## Analysis

Petitioner asserts that he was denied the effective assistance of counsel at trial and on direct appeal and that he is, therefore, entitled to post-conviction relief. Specifically, he contends that he was denied the effective assistance of counsel on appeal based upon appellate counsel's failure to: (1) argue on appeal that the trial court erred in denying Petitioner's motion to suppress because Petitioner was arrested without probable cause; (2) argue on appeal that the trial court erred in denying the motion to suppress because Petitioner was questioned without *Miranda* rights by Lieutenant Miller and Sergeant Justice; and (3) argue on appeal that the trial court erred in its ruling regarding *The First 48* raw footage and transcripts of the raw footage. Petitioner further contends that he was denied the effective assistance of counsel at trial based upon trial counsel's failure to: (4) properly handle *The First 48* issue; (5) allege "all pertinent violations" in his motion to suppress and present Petitioner as a witness at the motion to suppress hearing; (6) establish at the motion to suppress hearing that Courtney Washington did not identify Petitioner in the photographic lineup until after Petitioner was arrested; and (7) file a pretrial motion to dismiss the indictment. Finally, Petitioner argues that he is entitled to relief based upon: (8) the cumulative effect of counsels' errors.

### *Standard of Review*

To prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-

conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

### *Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, this court "need not address both elements if the petitioner fails to demonstrate either one of them." *Kendrick*, 454 S.W.3d at 457. Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

- 23 -

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

To establish a successful claim as relates to ineffective assistance of counsel for failing to litigate a motion to suppress, the petitioner must prove: (1) a suppression motion would have been meritorious; (2) counsel's failure to file or litigate such motion was objectively unreasonable; and (3) but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence. *Phillips v. State*, 647 S.W.3d 389, 404 (Tenn. 2022); *see Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). A petitioner must prove all three of these prongs for his claim of ineffective assistance of counsel to succeed. *Phillips*, 647 S.W.3d at 405. The petitioner has the burden to prove the factual allegations supporting his claims with clear and convincing evidence. *Id*. at 405-06 (citing Tenn. Code Ann. § 40-30-110(f)).

We apply the same *Strickland* test used to assess the effectiveness of trial counsel to assess the effectiveness of appellate counsel. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004). That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." *Campbell v. State*, 904 S.W.2d 594, 597 (Tenn. 1995); *see also Carpenter*, 126 S.W.3d at 886-88.

In *Carpenter*, our supreme court provided:

> Appellate counsel are not constitutionally required to raise every conceivable issue on appeal. Indeed, experienced advocates have long emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues. The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. Therefore, appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference.

*Carpenter*, 126 S.W.3d at 887 (internal quotation marks and citations omitted). The court then provided the following non-exhaustive list of inquiries when evaluating the strength of an omitted issue for the purpose of assessing deficiency:

- 24 -

1) Were the omitted issues "significant and obvious"?

2) Was there arguably contrary authority on the omitted issues?

3) Were the omitted issues clearly stronger than those presented?

4) Were the omitted issues objected to at trial?

5) Were the trial court's rulings subject to deference on appeal?

6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

7) What was appellate counsel's level of experience and expertise?

8) Did the petitioner and appellate counsel meet and go over possible issues?

9) Is there evidence that counsel reviewed all the facts?

10) Were the omitted issues dealt with in other assignments of error?

11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Id*. at 888 (quoting *Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999)) (internal quotation marks omitted). The court further explained:

> If a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, as it is in this case, then the reviewing court must determine the merits of the issue. Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim.

*Id*. at 887-88 (internal citations omitted).

## Petitioner's Claims

1. Failure of appellate counsel to argue on appeal that the trial court erred in denying the motion to suppress Petitioner's statements to officers because Petitioner was arrested without probable cause

Petitioner contends that he was denied the effective assistance of appellate counsel based upon counsel's failure to argue on appeal that his statements to officers should have been suppressed because he was arrested without probable cause. He argues that, when appellate counsel filed the direct appeal brief, "the legal landscape" supported the argument that he was arrested without probable cause. Petitioner asserts that Courtney Washington was not shown to be credible or reliable and that, therefore, officers could not rely upon the information obtained from him as a basis for probable cause for Petitioner's arrest. Petitioner insists that his statement should have been suppressed as "fruit of the poisonous tree."

At the post-conviction hearing, appellate counsel testified that he had reviewed the transcript of the motion to suppress hearing prior to filing the direct appeal brief. He could not recall why he did not include the issue of the motion to suppress in the brief but testified, "my suspicion is I probably researched these issues and found at the time, with the law existing then, I probably did not have a super strong argument."

In addressing this issue, the post-conviction court found:

It is uncontested that after the murder on October 5th, one of the co-defendants, [Daeshawn] Tate, told his girlfriend Kimberly Jude that [Petitioner] had shot the victim during the robbery. She knew him well, and on October 6th, the day before [Petitioner's] arrest, she told the police, and circled [Petitioner's] picture.

The morning of October 7th, [officers] arrested and interviewed co-defendant Courtney Washington, and he told the police the same thing. His statements to them about how the robbery/killing went down matched the physical evidence they had, the time of the incident, the fact that the victim's body was found shot and still in his wrecked car[.] [Sergeant Quinn], who also testified at the original suppression hearing in 2010, testified at the hearings on this petition about Courtney Washington's identification of [Petitioner] at the Homicide Office that morning as follows:

Q. Okay. And did he implicate [Petitioner] when he talked to you?

A. Yeah, he laid it all out --

Q. Okay.

A. -- about what everyone's role was.

Q. Did you guys -- when he told you about [Petitioner], did he say the full name, like, Victor Trezevant, first and last name, or did he just say --

A. Yes, they were childhood friends, went to high school together. He knew their first names, last names, where they lived, where [Petitioner's] girlfriend lived.

Q. Okay.

A. That's how well they knew each other.

. . . .

The police then took [Courtney Washington] out at 11:00 for him to show them where [Petitioner's] girlfriend lived so they could locate him. [Petitioner] testified at the post[-]conviction hearing that the police knocked on the door of Brittany's house and he could see a lot of police officers outside, so he waited 10 or 15 minutes, and when he finally left, they asked him his name and he told them he was Victor Trezevant. He was arrested and brought downtown. [Trial counsel] testified that "The thing about it is, they all three knew each other from years back, I think raised up in the same neighborhood. And so him saying, . . . Victor Trezevant . . . was with us. So he knows Victor." . . . "He's known him for ten or twelve years at the time, I think." Courtney Washington[,] a few hours after [Petitioner's] arrest[,] gave a formal, written statement and was asked to identify him in a photospread, which he did.

The post-conviction court determined that the trial court's pretrial ruling that officers had probable cause to arrest Petitioner was correct and that, therefore, Petitioner had not established deficient performance or any resulting prejudice based upon appellate counsel's failure to raise the issue on direct appeal.

When reviewing a trial court's ruling on a motion to suppress evidence, appellate courts "will uphold the trial court's findings of fact unless the evidence preponderates

- 27 -

against those findings." *State v. Stanfield*, 554 S.W.3d 1, 8 (Tenn. 2018). The party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing[,] as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

"Despite the deference given to [the] trial court's findings of fact, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness." *State v. Henry*, 539 S.W.3d 223, 232 (Tenn. Crim. App. 2017) (citing *State v. Montgomery*, 462 S.W.3d 482, 486 (Tenn. 2015)). In addition, "[d]etermining the existence of probable cause 'is a mixed question of law and fact that we review de novo.'" *State v. Reynolds*, 504 S.W.3d 283, 298 (Tenn. 2016) (citing *State v. Bell*, 429 S.W.3d 524, 529 (Tenn. 2014)).

The Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution prohibits unreasonable searches and seizures. A warrantless seizure "is presumed unreasonable and evidence seized thereby is subject to suppression, unless the State establishes one of the recognized exceptions to the warrant requirement." *State v. Dotson*, 450 S.W.3d 1, 50 (Tenn. 2014) (citing *State v. Bishop*, 431 S.W.3d 22, 36 (Tenn. 2014)). An arrest supported by probable cause is an exception to the warrant requirement. *State v. Echols*, 382 SW.3d 266, 277 (Tenn. 2012) (citing *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009)); *see Brown v. Illinois*, 422 U.S. 590, 598 (1975). "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" *Echols*, 382 SW.3d at 277-78 (quoting *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997)); *see Beck v. Ohio*, 379 U.S. 89, 91(1964). "'Probable cause must be more than a mere suspicion.'" *Echols*, 382 S.W.3d at 278 (quoting *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005)). However, probable cause "'deal[s] with probabilities[,] . . . not technical[ities,] . . . the factual and practical considerations of everyday life on which reasonable and prudent [persons] . . . act.'" *Id*. (quoting *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008)); *see Brinegar v. United States*, 338 U.S. 160, 175 (1949). Moreover, a determination of probable cause encompasses the accumulation of information known to law enforcement collectively if a sufficient nexus of communication exists between the arresting officer and a fellow officer with pertinent knowledge. *Echols*, 382 S.W.3d at 278 (citation omitted).

Tennessee courts have long held that information provided by a citizen-informant carries a presumption of reliability. In other words, if the source of the information is a

person (1) who is known to the police, (2) who is not part of the "criminal milieu," and (3) whose motivation is to aid the police without any expectation of remuneration, then the information is deemed reliable and is sufficient to provide probable cause for arrest. *State v. Melson*, 638 S.W.2d 342, 354-56 (Tenn. 1982). However, the law at the time of Petitioner's trial required that, "[i]f the arresting officers rely in part on information from an informant from the criminal milieu, they must be able to demonstrate that the informant (1) has a basis of knowledge and (2) is credible or his information is reliable." *State v. Lewis*, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000) (citing *State v. Jacumin*, 778 S.W.2d 430 (Tenn. 1989)); *see also Bishop*, 431 S.W.3d at 38.[3] The same test was applied when "determining whether the self-inculpatory statement of one suspect may give police probable cause to arrest a person the suspect identifies as his or her accomplice." *Bishop*, 431 S.W.3d at 40. In *Bishop*, the court noted that independent corroboration of an informant's statement may buttress the credibility of the information, but "it is not necessary to corroborate every detail of the informant's information . . . or to directly link the suspect to the commission of the crime." *Id*. at 38 (internal citations and quotation marks omitted).

Upon review, we agree with the post-conviction court that officers had probable cause to arrest Petitioner. The record shows that, prior to Petitioner's arrest, officers involved in the investigation responded to the University of Memphis campus where they observed the victim, who had crashed his car into a tree. After the victim was removed from the car, officers learned that he had been shot, that the victim had $7,400 in cash in his pockets, and that there was a nine-millimeter Luger spent bullet casing on the floorboard on the passenger side of the vehicle. Officers were approached by several witnesses at the scene, who reported that they had heard a gunshot and provided descriptions of suspicious individuals and a suspiciously parked gold Grand Marquis. One of the witnesses told officers that she had seen a gold Grand Marquis parked backwards with the engine off, the windows down, and three people inside. Officers also interviewed one of the victim's friends, who informed officers that the victim had been "flashing" his money around and that people were "talking about it all over."

Days later, on October 5, 2007, Daeshawn Tate told his girlfriend, Ms. Jude, that [Petitioner] had shot the victim during the robbery. Ms. Jude knew Petitioner well, and on October 6, 2007, she reported what she had learned to officers. She identified each of the defendants, including Petitioner, as being involved in the homicide. She also identified Petitioner in a photographic lineup provided by officers. The following morning, on October 7, 2007, officers arrested Courtney Washington and interviewed

---

[3] The Tennessee Supreme Court has since overruled *Jacumin* and adopted the "totality of the circumstances" test found in *Illinois v. Gates*, 462 U.S. 213 (1983). *See State v. Tuttle*, 515 S.W.3d 282, 289 (Tenn. 2017).

him.  Courtney Washington "laid it all out" and explained each of the defendants' role in the offense, including Petitioner's role as the shooter.  He identified Petitioner, his long-time friend, by name.  His statements to officers about how the robbery and murder occurred matched the physical evidence, the time of the incident, and the fact that the victim's body was found shot and still in his wrecked car.  After this interview, Courtney Washington led officers to Petitioner's girlfriend's house, where they located Petitioner and took him into custody.  Taken together, this evidence, which was known to officers at the time of Petitioner's arrest, supports the trial court's finding of probable cause.  *See Echols*, 382 SW.3d at 277-78

Petitioner argues the State failed to demonstrate that Ms. Jude's and Courtney Washington's statements were credible and reliable and that officers failed to independently corroborate their information.  Ms. Jude, however, was not involved in the offense in any way; she was a citizen informant who was known to the police, was not part of the criminal milieu, and was motivated to aid the police without any expectation of remuneration.  Accordingly, the information she provided carried a presumption of reliability.  *See Melson*, 638 S.W.2d at 354-56.  Although we agree with Petitioner that Courtney Washington, as an accomplice to the crime, is properly categorized as a criminal informant, the State sufficiently demonstrated the basis of his knowledge and that his information was reliable.  *See Lewis*, 36 S.W.3d at 98.  The basis of his knowledge was his presence as a witness and participant in the crime, and he had firsthand knowledge of Petitioner's involvement in the attempted robbery and homicide.  His information was reliable because much of it was corroborated by independent evidence gathered by officers at the scene and from witnesses, as detailed above.  This independent corroboration buttressed the information provided by Courtney Washington.  *Bishop*, 431 S.W.3d at 40.

Considering the evidence gathered during the investigation, including the information provided by Ms. Jude and Courtney Washington, officers had probable cause for the warrantless arrest of Petitioner.  Thus, Petitioner has not shown that appellate counsel's decision not to raise the issue on appeal amounted to deficient performance, nor has he shown a reasonable probability that this issue "would have affected the result of [Petitioner's] appeal."  *Campbell*, 904 S.W.2d at 597.  He is not entitled to relief on this claim.

<u>2. Failure of appellate counsel to argue on appeal that the trial court erred in denying the motion to suppress because Petitioner was questioned before being advised of his *Miranda* rights by Lieutenant Miller and Sergeant Justice</u>

Petitioner contends that appellate counsel rendered ineffective assistance based upon counsel's failure to argue on appeal that the trial court erred in denying his motion to suppress because he was questioned before being advised of his *Miranda* rights.  While

Petitioner acknowledges that Sergeant Quinn informed him of his *Miranda* rights at 5:20 p.m., Petitioner argues that his confession should have been suppressed because he was not provided with new *Miranda* warnings when Lieutenant Miller and Sergeant Justice began interviewing him around 8:00 p.m. He insists that a reasonable attorney in appellate counsel's shoes would have argued on appeal that Lieutenant Miller and Sergeant Justice improperly questioned Petitioner without advising him of his *Miranda* rights and that appellate counsel's failure to do so prejudiced the defense.

The record reflects that, prior to trial, counsel filed a motion to suppress Petitioner's statements, arguing that the officers failed to properly advise him of his *Miranda* rights prior to custodial interrogation. Trial counsel litigated the motion at a pretrial hearing. The proof at the hearing established that on October 7, 2007, at 5:20 p.m., Sergeants Quinn and Collins presented Petitioner with a *Miranda* Advice of Rights form and had Petitioner read the form aloud. This encounter occurred in the interview room at the Robbery Bureau. Petitioner indicated that he understood his rights, and he signed and dated the form. Sergeant Quinn testified that there was no indication Petitioner did not understand the Advice of Rights form or that he was under the influence of drugs or alcohol. Sergeant Quinn testified that he then left the interview room to question other individuals about the case.

At 8:00 p.m., Lieutenant Miller entered the interview room at the Robbery Bureau to complete Petitioner's charging documents and to obtain Petitioner's fingerprints. During that process, Petitioner initiated a conversation about the charges and provided Lieutenant Miller with his version of the events and his role in them. Lieutenant Miller testified that Petitioner admitted to participating in the planning and execution of the robbery, but Petitioner claimed that Devin Jefferson was the person who shot the victim. Lieutenant Miller did not readvise Petitioner of his *Miranda* rights during this conversation. Lieutenant Miller testified that he knew that Petitioner had already been advised of his rights.

Sergeant Justice testified that, at approximately 9:00 p.m., Lieutenant Miller instructed her and Sergeant Collins to enter the interview room at the Robbery Bureau and take a statement from Petitioner. Sergeant Justice testified that she was aware that other officers had already advised Petitioner of his *Miranda* rights. As such, she did not advise Petitioner of his *Miranda* rights again prior to obtaining an oral statement. Sergeant Justice testified that she did readvise Petitioner of his *Miranda* rights prior to obtaining his typed statement. She testified that Petitioner's typed statement was extremely detailed and that Petitioner made nine corrections to the typed statement. She said that, in the typed statement, Petitioner admitted to participating in the planning and attempted execution of the robbery, but he claimed that Devin Jefferson was the person who shot the victim. At

the conclusion of the motion to suppress hearing, the trial court found no violation of Petitioner's Fifth Amendment rights and denied the motion.

At the post-conviction hearing, appellate counsel, an experienced attorney, testified that he reviewed the entire record and the transcripts from the pretrial hearings and trial and conferred with trial counsel prior to filing the direct appeal brief. He testified that he could not recall why he did not include this specific issue in the brief but said that he "probably researched these issues and found at the time, with the law existing then, I probably did not have a super strong argument."

In denying relief on this claim, the post-conviction court found, as follows:

> This court ruled in the original motion to suppress hearing that [Petitioner's] statements were not taken in violation of the Fifth Amendment, and this ruling was a correct one from the proof offered at that hearing. Therefore this court finds no prejudice [to Petitioner] in his attorney's not appealing that ruling by the court. [Petitioner] testified to several alleged facts for the very first time when he testified in the hearing on this petition, facts that were not presented in the original motion to suppress hearing because he did not give them to his attorneys at the time, [fourteen] years ago. This court finds these facts severely lacking in credibility, fabricated by [Petitioner] for the sole purpose of re-litigating this issue . . . . This allegation has no merit.

Upon review, we agree with the post-conviction court's determination. "A valid waiver of *Miranda* rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights." *State v. Rogers*, 188 S.W.3d 593, 606 (Tenn. 2006) (citing *Wyrick v. Fields*, 459 U.S. 42, 47 (1982)). In deciding whether it is necessary to readminister warnings, the court must look to the totality of the circumstances. *Id*. Factors include:

> 1) the amount of time that has passed since the waiver; 2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; 3) any official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) any indicia that the suspect subjectively understands and waives his rights.

*Id*.

Here, the amount of time that passed since the waiver was approximately four hours, which is less than time lapses previously upheld by our courts. *See id.* at 608 ("Neither the

five-hour time lapse nor any intervening event rendered Rogers incapable of remembering the prior advisement of his rights."). Although the officers conducting the interview changed, the location of the interview remained the same, and the subject matter never changed. Petitioner read the Advice of Rights form out loud, and he expressed his understanding of his rights when signing his initial waiver, when he acknowledged his rights again during his formal statement, and when he reviewed and signed his formal typed statement. Petitioner was twenty-one years old at the time of the interview, and he had been arrested previously for other offenses. Considering the totality of the circumstances, we conclude that the officers did not need to renew Petitioner's *Miranda* warnings. *Id.* at 606. Because this issue lacks merit, Petitioner cannot prevail on this allegation of ineffective assistance of appellate counsel. *Carpenter*, 126 S.W.3d at 887-88.

### 3. Failure of appellate counsel to argue on appeal that the trial court erred in its ruling regarding *The First 48* raw footage and transcripts of the raw footage

Petitioner contends that appellate counsel rendered ineffective assistance based upon counsel's failure to argue on appeal that the trial court erred in its ruling on *The First 48* raw footage and transcripts. Petitioner maintains that appellate counsel should have argued that the raw footage from *The First 48* was not covered by the media privilege or that, if it was, Petitioner made an adequate showing to divest it of that privilege. Petitioner acknowledges that the motion for new trial failed to mention the transcripts of the footage but argues that the motion for new trial should be "read broadly" to include the transcript issue and that appellate counsel was deficient for not raising that issue.

Prior to trial, counsel also filed a motion to produce any video and audio-taped statements of the defendants. In the motion, while acknowledging that the television show *The First 48* recorded Petitioner's statement, trial counsel argued that, due to the Memphis Police Department's contractual relationship with the production company, the State had control over those recordings. Trial counsel also filed a pretrial motion for the disclosure of all the co-defendants' statements and a motion for production of evidence, including *The First 48* contract and footage. Counsel then filed a supplemental motion for production of the video and audio-taped statements, adopting co-defendant Devin Jefferson's motion on the issue. After a hearing, the trial court denied the defense motions and granted a motion to quash the subpoenas that had been filed by *The First 48*.

At the post-conviction hearing, appellate counsel testified that he reviewed the entire record and the transcripts from the pretrial hearings and the trial, and he conferred with trial counsel prior to filing Petitioner's direct appeal brief. Appellate counsel created a checklist of issues, researched the issues, and decided whether issues had merit. Regarding this issue, appellate counsel testified that he reviewed the media shield law and the "higher degree of protection" that it provided to *The First 48*. He stated that he

ultimately determined the argument did not have "strong merit" and would not be successful, so he decided not to pursue it on appeal. Appellate counsel also noted that the raw footage had never been in the State's custody and control and that it had already been destroyed. As to the existence of any transcripts of the raw footage, appellate counsel did not recall the specific issue, but he opined that the media shield law would also control that issue.

In its written order, the post-conviction court made the following factual findings regarding this claim:

> Kirkstall Road Enterprises, Inc., a Delaware corporation, and a subsidiary of Granada Entertainment USA, a California corporation, produced a non-fiction television show about two separate, unrelated homicides entitled "The Last Yard/Root of All Evil." "The Last Yard" half of the show dealt with the killing of Taylor Bradford, a University of Memphis football player who was the victim in [Petitioner's] indictment. As part of the television program *The First 48*, the broadcast showed interviews by the police of several witnesses, including oral statements of admissions or denials given by some of the four defendants, and portrayed conversations among police officers and homicide detectives as they investigated the case. The producers of the show had a contract with Memphis and Shelby County to allow their employees liberal access throughout the investigation during the filming of the show.

> As part of the defense investigation of all four co-defendants, subpoenas were issued requesting from the two corporations the names and contact information for all field producers and cameramen who worked on "The Last Yard" (the other half of the one hour show entitled "Root of all Evil" concerned a different, unrelated homicide). Also requested of them by the defense were any videotaped or audiotaped statements of witnesses or suspects being maintained, copied or provided to the Memphis Police Department. Granada, represented by counsel, asserted the subpoenas should have been quashed as the information requested was subject to the qualified privilege enacted by the Tennessee legislature as [Tennessee Code Annotated section] 24-1-208 (referred to as the Shield Law in *Austin v. Memphis Pub. Co.*, 655 S.W.2d 146 (Tenn. 1983)), which grants to news media a qualified protection from producing certain information and sources of information.

The court noted that, during the hearing on the motion,

an affidavit filed by Granada on August 18, 2009, stated that Granada Entertainment didn't have verbatim transcripts of the interviews or the *Miranda* procedure, but only editorial notes consisting of less than 4 minutes of the lengthy custodial interview of [Petitioner] by the police, and that "Granada employees do not transcribe police's administering of *Miranda* warnings, because they know such material will not be used in the show."

The post-conviction court continued:

Although the defense suggested that as Granada had a contract with the City of Memphis to be allowed liberal access to the events surrounding the investigation, they may have become agents of the police at some point and ceased to become "independently engaged in gathering information for publication or broadcast," no showing was ever made that they had ever become investigators or aids to the police through any offer of proof at any of the settings on this issue from the initial June 3, 2009, hearing on the motion to quash through the date of the final hearing on the motion. This court entered an order finding that Granada was entitled to the protection of this privilege. As John X. Kim, Executive Producer of [*The First 48*], stated in his affidavit filed June 1, 2009, "enforcement of the subpoena in this case would discredit Gr[a]nada as a disinterested gatherer of information and would turn members of the media into witnesses. It is critical to Gr[a]nada's production of the Series that it be able to maintain its role as a disinterested chronicler of information. In particular, witnesses and suspects in the future may decline to participate in the Series if they believe the that the field producers and cameraman may be testifying against them in an eventual trial."

The post-conviction court determined its prior ruling—that Granada was entitled to the protection of the media privilege—was proper. Additionally, the court noted that there had been no showing at the post-conviction hearing that, if the subpoenas had not been quashed, "any material that might have been able to be turned over that had not been destroyed would have been of any benefit to [Petitioner]." The court concluded, therefore, that Petitioner had failed to show deficient performance or any prejudice resulting from appellate counsel's failure to raise *The First 48* issue on appeal. The post-conviction court also found that the defense failed to show by clear and convincing evidence that Granada should be divested of its privilege under Tennessee Code Annotated section 24-1-208(c).

### a. Media privilege

The media privilege statute broadly describes media as "a person engaged in gathering information for publication or broadcast connected with or employed by the news media or press, or who is independently engaged in gathering information for publication or broadcast." Tenn. Code Ann. § 24-1-208(a). Under this statute, a media organization, such as *The First 48*, and its personnel are afforded protections for the information they gather during the course of their work. *See State v. Kendrick*, 178 S.W.3d 734, 737 (Tenn. Crim. App. 2005). Moreover, the defense failed to make an adequate showing to divest *The First 48* of the media privilege. A party seeking information procured for broadcast must show "by clear and convincing evidence" that:

> (A) There is probable cause to believe that the person from whom the information is sought has information which is clearly relevant to a specific probable violation of law;
>
> (B) The person has demonstrated that the information sought cannot reasonably be obtained by alternative means; and
>
> (C) The person has demonstrated a compelling and overriding public interest of the people of the state of Tennessee in the information.

Tenn. Code Ann. § 24-1-208(c)(2)(A)-(C).

Upon review, we agree with the post-conviction court's determination that the trial court's ruling was proper. It is undisputed that *The First 48* had information from Petitioner's interview with officers; representatives from *The First 48* were present and recorded the interview. However, at the hearing on the motion to quash, it was determined that all parties had a copy of the aired television show; that the Memphis Police Department had been given a "rough cut," which the State obtained and made available to the defense; and that all other video and audio tapes, out-takes, and interview notes "had been left on the cutting room floor or destroyed, and were no longer in the possession of Granada." Thus, even if the trial court found that the raw footage must be produced, it no longer existed and could not be produced by Granada. In any event, Petitioner has failed to show that the information sought could not reasonably be obtained by alternative means. As noted by the State, the information from Petitioner's interview was available in other forms, such as the testimony of the officers, Petitioner, and his co-defendants as well as their formal typed statements. *See e.g., Kendrick*, 178 S.W.3d at 738. Finally, although any information about the investigation of Petitioner's case gathered by Granada might be of compelling interest to Petitioner, Petitioner failed to demonstrate "a compelling and overriding public interest of the people of the state of Tennessee in the information." Tenn.

Code Ann. § 24-1-208(c)(2)(C). Petitioner has not proven the criteria set out in the statute to divest the media privilege, and therefore, Petitioner has not shown that appellate counsel rendered ineffective assistance by failing to raise the issue on appeal. *See Carpenter*, 126 S.W.3d at 887-88.

### b. *Ferguson* claim

Petitioner raises an additional claim regarding appellate counsel's handling of *The First 48* issue; he contends that appellate counsel rendered ineffective assistance by failing to argue on appeal that the raw footage and transcripts fell under *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). He acknowledges that trial counsel did not make this argument before the trial court. Waiver notwithstanding, the post-conviction court specifically found that had the *Ferguson* issue been raised, it would have denied the motion because the State never possessed the footage and did not destroy it. As explained more fully below, we agree with the post-conviction court's determination that the issue lacks merit. When an omitted issue is without merit, a petitioner cannot prevail on an ineffective assistance of counsel claim. *Carpenter*, 126 S.W.3d at 887-88. Petitioner is not entitled to relief.

### 4. Trial counsel's failure to properly handle *The First 48* issue

Petitioner asserts that trial counsel rendered ineffective assistance by failing to argue under *Ferguson* that the State had a duty to preserve the raw footage and transcripts of the raw footage from *The First 48*. He insists that, had trial counsel raised a *Ferguson* claim,

> there is a reasonable probability that the trial court would have either (a) dismissed the indictment against Petitioner, (b) prohibited the State from presenting Courtney Washington and Daeshawn Tate as witnesses at trial and prohibited the State from using Petitioner's statements to police at trial, or (c) issued a special jury instruction on lost or destroyed evidence.

Regarding this issue, trial counsel testified that he did not pursue the lost footage as a *Ferguson* issue because he did not believe the State had the duty to preserve the footage; he recalled that the State did not possess the footage and that a private media company recorded over the footage in the normal course of business. The post-conviction court concluded that the claim had no merit and that it would not have granted relief had trial counsel raised it pretrial. The court found that,

> if a *Ferguson* dismissal or jury instruction had been requested by . . . trial counsel, . . . *Ferguson* would not have applied because the State never had possession of any of the raw footage Gr[a]nada had taken, and the police

- 37 -

would have had no reason to request it, having no need for it. The State did not destroy or fail to preserve any of it, never possessing it.

When a defendant raises a *Ferguson* claim, a trial court must first "determine whether the State had a duty to preserve the evidence." *State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013). "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Id*. (quoting *Ferguson*, 2 S.W.3d at 917). To meet this constitutional materiality standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. (footnote omitted).

If the proof demonstrates the existence of a duty to preserve evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;
>
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
>
> 3. The sufficiency of the other evidence used at trial to support the conviction.

*Ferguson*, 2 S.W.3d at 917 (footnote omitted). The trial court is required to balance these factors to determine whether conducting a trial without the missing evidence would be fundamentally fair. *Merriman*, 410 S.W.3d at 785. "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id*.

Upon review, the record clearly shows that the State never possessed these materials, and Tennessee courts have repeatedly held that the State is not required to turn over material that was not in the possession or control of the State when it was lost. *See, e.g., State v. Hutchison*, 898 S.W.2d 161, 168 (Tenn. 1994); *State v. Carter*, 682 S.W.2d 224, 226 (Tenn. Crim. App. 1994); *State v. Middlebrooks*, 840 S.W.2d 317, 333 (Tenn. 1992); *State v. Fox*, 701 S.W.2d 233, 236 (Tenn. Crim. App. 1985); *Malone v. State*, No. W2016-00666-CCA-R3-PC, 2017 WL 1404374, at *15 (Tenn. Crim. App. Apr. 18, 2017) (another post-conviction case involving a *Ferguson* allegation regarding footage from *The First 48*), *perm. app. denied* (Tenn. Aug. 21, 2017); *State v. Gaines*, No. M2013-02272-

CCA-R3-CD, 2014 WL 4179123, at *8 (Tenn. Crim. App. Aug. 22, 2014), *no perm. app. filed*; *State v. Somerville*, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730, at *4-5 (Tenn. Crim. App. Feb. 11, 2002), *no perm. app. filed*. Accordingly, Petitioner has failed to establish deficient performance based upon trial counsel's failure to argue that the raw footage and transcripts from *The First 48* fell under *Ferguson* or any resulting prejudice to the defense. *Strickland*, 466 U.S. at 687.

Finally, Petitioner claims that trial counsel failed to mention "transcripts of the raw footage" in motions relating to *The First 48* and that, had counsel done so, access to the "transcripts" could have been litigated on appeal. However, the post-conviction court reviewed this issue at length and found no transcripts ever existed, and any brief notes taken by the production company employees no longer existed. The record does not preponderate against the post-conviction court's findings, and Petitioner is not entitled to relief.

5. Trial counsel's failure to allege "all pertinent violations" in the motion to suppress and present Petitioner as a witness at the suppression hearing

Petitioner asserts that trial counsel rendered ineffective assistance by failing to allege "all pertinent violations" in the motion to suppress and call him to testify at the motion to suppress hearing. Petitioner maintains that, if counsel had included the allegations in the motion to suppress and called him to testify at the hearing, he would have testified to "some very critical information" that likely would have changed the result of the suppression hearing. Specifically, Petitioner would have testified that:

> he asked for counsel, asked to cut off questioning, was intoxicated during the interrogation, was denied a phone call, was denied use of the restroom, was told that he would receive a life sentence, was told that everybody was saying that he killed someone, was told that he was only being viewed as a witness, was told that he was not under arrest, was told that he would "go down for first degree murder" if he did not talk, and was told that he would never see his child or the mother of his child again. Petitioner also would have testified that he had a ninth-grade education and no prior experience with being interrogated by the police.

In denying relief on these claims, the post-conviction court found that only two grounds for relief were argued at the hearing on the motion to suppress—that there was no probable cause for Petitioner's arrest and that there was a delay between the time Petitioner was read his *Miranda* rights and his questioning by a different officer. The post-conviction court found that "[n]either of these grounds needed the testimony of [Petitioner] to put them forward" and noted that "[a]ny time a defendant is called as a witness, there is a

- 39 -

danger that he or she might blurt something out under oath during cross-examination that might be used against the defendant later at trial." The post-conviction court further found that Petitioner's above-quoted allegations were "fabricated"; that Petitioner did not convey the fabricated facts to trial counsel; that Petitioner's testimony at the post-conviction hearing concerning the allegations was "incredible"; and that the testimony of the officers, both at the suppression hearing and post-conviction hearing, "was very credible as to the propriety of honoring [Petitioner's] rights and following all correct and constitutional police procedure[.]"

Upon review, we conclude that Petitioner failed to prove trial counsel's performance was deficient. *Strickland*, 466 U.S. at 687. First, as noted by the post-conviction court, the grounds for relief alleged in the motion to suppress did not necessitate Petitioner's testimony, and trial counsel testified about the potential dangers of having a defendant testify at a suppression hearing. Moreover, trial counsel testified that, if Petitioner had told him about the alleged behavior of the officers, he would have raised the allegations in the motion to suppress if he thought they were "legitimate." Finally, the post-conviction court found that Petitioner had fabricated the allegations and that the officers' testimony denying the allegations had been credible. Although Petitioner insists that his testimony was "more credible" than that of the officers, we again note that "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456.

Petitioner has not shown that trial counsel was deficient in failing to allege "all pertinent violations" in the motion to suppress and to call Petitioner as a witness at the suppression hearing. Having failed to demonstrate trial counsel's deficient performance, we need not address whether the alleged deficiency resulted in prejudice to the defense. *Kendrick*, 454 S.W.3d at 457. Petitioner is not entitled to relief.

6. Trial counsel's failure to establish at the motion to suppress hearing when Courtney Washington identified Petitioner in the photographic lineup

Petitioner contends that his arrest was not supported by probable cause because Courtney Washington did not identify him in a photographic lineup before his arrest and that trial counsel rendered ineffective assistance by failing to raise the issue in the motion to suppress.

In addressing this allegation, the post-conviction court found:

[I]t is uncontested that after the murder on October 5th, one of the co[-]defendants, [Daeshawn] Tate, told his girlfriend Kimberly Jude that

[Petitioner] had shot the victim during the robbery.  She knew him well, and on October 6th, the day before [Petitioner's] arrest, she told the police, and circled the [Petitioner's] picture.  The morning of October 7th, they arrested and interviewed co-defendant Courtney Washington, and he told the police the same thing.  His statements to them about how the robbery/killing went down matched the physical evidence they had, the time of the incident, the fact that the victim's body was found shot and still in his wrecked car[.]  At the hearing on this petition, [Sergeant] Quinn testified . . . as follows:

> Q. . . . Now turning to that morning of October 7th, do you remember talking to a Courtney Washington when he was brought into the Homicide Office?
>
> A. Yes.
>
> Q. Okay.  And did he implicate [Petitioner] when he talked to you?
>
> A. Yeah, he laid it all out --
>
> Q. Okay.
>
> A. -- about what everyone's role was.
>
> Q. Did you guys -- when he told you about [Petitioner], did he say the full name, like, Victor Trezevant, first and last name, or did he just say --
>
> A. Yes, they were childhood friends, went to high school together.  He knew their first names, last names, where they lived, where [Petitioner's] girlfriend lived.
>
> Q. Okay.
>
> A. That's how well they knew each other.

He then testified that although he started the interview with Courtney Washington that morning, he didn't show Washington a photospread including [Petitioner] . . . until later that afternoon at 3:52 pm when he was taking Washington's formal statement after the Task Force and [Sergeant]

- 41 -

Collins took them out to show them where [Petitioner's] girlfriend lived. [Petitioner] was arrested at his girlfriend's house at 1:45 pm.

The post-conviction court determined that Petitioner's arrest "was legal [and] made upon probable cause" and that Petitioner failed to establish deficient performance or any resulting prejudice based upon trial counsel's failure to raise the issue in the motion to suppress.

Upon review, we agree with the post-conviction court that, although Courtney Washington did not pick Petitioner out of a photographic lineup until 3:52 p.m., officers had probable cause for Petitioner's arrest at 1:45 p.m. Ms. Jude provided information about Petitioner's role in the homicide and identified Petitioner in a photographic lineup the day before his arrest. Moreover, in the hours before Petitioner's arrest, Courtney Washington, who had known Petitioner since childhood, identified Petitioner by first and last name and provided his address, detailed Petitioner's role in the homicide, and took officers to Petitioner's girlfriend's home to assist in the locating of Petitioner. Petitioner's identity simply was not at issue at the time of his arrest. Petitioner has not shown that the motion to suppress would have been meritorious had trial counsel raised this issue. Accordingly, he is not entitled to relief. *Phillips*, 647 S.W.3d at 404-05.

### 7. Trial counsel's failure to file a pretrial motion to dismiss the indictment

Petitioner asserts that trial counsel rendered ineffective assistance by failing to file a pretrial motion to dismiss the indictment based upon the lack of the trial court clerk's signature on the indictment.

In denying relief on this claim, the post-conviction court found that Petitioner had failed to cite any authority for the premise that, if an indictment is not signed by the trial court clerk, it is void. The court found that, although article VI, section 12 of the Tennessee Constitution states that "All writs and other process shall run in the name of the State of Tennessee and bear test and be signed by the respective clerks," there is "no law stating that this wording refers to an indictment or that the absence of a clerk's signature voids the indictment." Moreover, the court determined that, even if Petitioner's indictment should have been signed by the court clerk, the omission did not void the conviction after trial. Finally, the post-conviction court found that, even if trial counsel had filed a motion to dismiss the indictment based on the lack of the clerk's signature, the court "would not have dismissed the indictment . . . but would rather merely have asked the clerk to sign it, to satisfy that procedural safeguard, and [Petitioner] would still have been tried on that indictment with the resultant verdict."

- 42 -

Petitioner has not shown that trial counsel was deficient for failing to file a pretrial motion to dismiss the indictment based upon the lack of the trial court clerk's signature. This court has previously determined that "[n]either statutory nor constitutional provisions require that a valid indictment must include the signature of the court clerk." *Flannigan v. State*, No. W2003-02979-CCA-R3-PC, 2005 WL 491529, at \*2 (Tenn. Crim. App. Feb. 28, 2005), *no perm. app. filed*; *see also Hodges v. State*, No. W2003-01006-CCA-R3-CO, 2003 WL 23100813, at \*1 (Tenn. Crim. App. Dec. 31, 2003) (stating that there is no statutory requirement for the clerk to sign the indictment), *perm. app. denied* (Tenn. May 10, 2004); *Singo v. State*, No. M2021-00299-CCA-R3-HC, 2021 WL 5505033, at \*2 (Tenn. Crim. App. Nov. 24, 2021) (concluding that the petitioner's claim that his indictment was void because it was not signed by the court clerk was without merit), *perm. app. denied* (Tenn. Mar. 24, 2022). Additionally, Petitioner has not shown any resulting prejudice. As noted by the post-conviction court, even if trial counsel had filed a motion to dismiss the indictment based on the lack of the clerk's signature, the court "would not have dismissed the indictment . . . but would rather merely have asked the clerk to sign it, to satisfy that procedural safeguard, and [Petitioner] would still have been tried on that indictment with the resultant verdict." *See Bass v. State*, No. M2003-01235-CCA-R3-PC, 2004 WL 508504, at \*2 (Tenn. Crim. App. Mar. 16, 2004) (concluding that the signature of the clerk on an indictment was a procedural, rather than substantive, safeguard), *no perm. app. filed*.

Petitioner has failed to prove that trial counsel's performance was deficient or that the alleged deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. He is not entitled to relief on this claim.

### 8. Cumulative error

Finally, Petitioner insists that cumulative error warrants reversal in this case. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id*. at 77. In other words, only where there are multiple deficiencies does this court determine whether they were cumulatively prejudicial. In this case, because we have not found any errors, cumulative error review is unwarranted. Petitioner is not entitled to relief.

## Conclusion

Based upon the foregoing, we affirm the judgment of the post-conviction court.

_s/Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE